#30354-SRJ
**2024 S.D. 58**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE DISCIPLINE OF
JASON R. RAVNSBORG
AS AN ATTORNEY AT LAW

\* \* \* \*

ORIGINAL PROCEEDING

\* \* \* \*

THOMAS H. FRIEBERG of
State Bar of South Dakota
Beresford, South Dakota                    Attorneys for Disciplinary
                                           Board.


MICHAEL J. BUTLER
Rapid City, South Dakota

ALLISON R. SANNER
Sioux Falls, South Dakota                  Attorneys for respondent.

\* \* \* \*

ARGUED
FEBRUARY 14, 2024
OPINION FILED **09/18/24**

#30354

JENSEN, Chief Justice

[¶1.]        This is a disciplinary proceeding involving former South Dakota

Attorney General Jason Ravnsborg, a member of the State Bar of South Dakota.

After conducting an initial investigation, the Disciplinary Board of the State Bar of

South Dakota (the Board) found that Ravnsborg's conduct following an accident in

which he struck and killed a pedestrian with his vehicle, violated various sections of

Rule 8.4 of the South Dakota Rules of Professional Conduct.  The Board filed

findings of fact, conclusions of law and a formal charging document with this Court

recommending a 26-month suspension, retroactive to the date that Ravnsborg was

impeached and removed as attorney general.  After Ravnsborg denied the Board's

findings, conclusions, and recommendation, this Court appointed a referee (the

Referee) to conduct an evidentiary hearing.  The Referee entered a written decision

finding that Ravnsborg violated Rule 8.4(e) of the Rules of Professional Conduct and

recommended a public censure.  We find that Ravnsborg violated Rule 8.4(c), (d),

and (e) of the Rules of Professional Conduct and suspend Ravnsborg's license to

practice law in South Dakota for a period of six months.

### General Background

[¶2.]        Ravnsborg graduated from the University of South Dakota School of

Law in 2001.  He was admitted to practice law in South Dakota that same year and

was later admitted to practice in Iowa.  Since being admitted, Ravnsborg has

continued to be a licensed attorney in good standing with the State Bar of South

Dakota.

[¶3.]    Prior to entering law school, Ravnsborg joined the United States Army Reserve and has served several tours of duty throughout his career. His active rank is lieutenant colonel and he is on the Army Reserve list of candidates for possible promotion to colonel. In addition to his military service, Ravnsborg maintained a private law practice in Yankton, South Dakota, before becoming involved in state politics. In 2018, Ravnsborg was elected to be South Dakota's attorney general, and took office in January 2019.

[¶4.]    On September 12, 2020, Ravnsborg drove his personal vehicle to attend a Republican political event in Redfield, South Dakota. After the event ended, he began driving back to his residence in Pierre. At approximately 10:30 p.m., after passing through Highmore, Ravnsborg's vehicle struck and killed Joe Boever, who was walking on the shoulder of the road.

[¶5.]    Ravnsborg slowly brought his vehicle to a stop and called 911. He immediately told the 911 operator, "I'm the Attorney General. And I am . . . I don't know . . . I hit something." The 911 operator asked him if he hit "a deer or something" to which he responded, "I have no idea, yeah it could be, I mean it was right in the roadway." Hyde County Sheriff Mike Volek was dispatched to Ravnsborg's location.

[¶6.]    Ravnsborg and Sheriff Volek briefly scanned the surrounding area but did not locate what Ravnsborg had hit. Shortly thereafter, Sheriff Volek offered Ravnsborg his personal vehicle to drive back to Pierre because Ravnsborg's vehicle was unable to be driven.

[¶7.]    The next day, Ravnsborg returned to Highmore with his chief of staff, Tim Bormann, to return Sheriff Volek's personal vehicle.  On the way, Ravnsborg and Bormann stopped at the crash scene.  Ravnsborg quickly discovered Boever's body just off the side of the road, near where the crash occurred.  Bormann and Ravnsborg then drove to Sheriff Volek's residence to inform him of their discovery.  Sheriff Volek directed Ravnsborg to return to Pierre.  Sheriff Volek contacted the South Dakota Highway Patrol and the Division of Criminal Investigation (DCI).  Because the DCI is under the direction and control of the attorney general's office, the North Dakota Bureau of Criminal Investigation (NDBCI) was contacted to investigate the crash.[1]  The South Dakota Highway Patrol was also involved in the post-accident investigation.[2]

[¶8.]    Ravnsborg was interviewed two separate times by the NDBCI.  Ravnsborg also turned over both his personal and work cell phones to allow NDBCI to download metadata that was generated by the phones around the time of the

---

1.    SDCL 23-3-6 provides, "[t]he Division of Criminal Investigation heretofore established by law shall continue under the superintendency and control of the attorney general as a division of his department.  The records and equipment for such division heretofore transferred to or acquired by the attorney general shall be under the custody and control of the attorney general."

2.    SDCL 1-51-2 provides that the Highway Patrol is a division of the Department of Public Safety.  The Secretary of the Department of Public Safety is appointed by the Governor, with the advice and consent of the Senate, and the Department of Public Safety is under the supervision of the Governor.  S.D. Const. art. IV, § 9.  Ravnsborg has claimed the investigation and subsequent proceedings, including this disciplinary proceeding, were influenced by politics and the Governor's personal animosity toward him.  Those concerns, however, do little to address the substance of the allegations before us which include the results of what appears to be a thorough and professional underlying criminal investigation.

crash. Law enforcement also drew Ravnsborg's blood and conducted toxicology tests. The South Dakota Highway Patrol performed an accident reconstruction and NDBCI interviewed multiple individuals who interacted with Ravnsborg prior to and after the accident.

[¶9.] Ravnsborg denied he had consumed any drugs or alcohol on the night of the accident, which was confirmed by witnesses who observed him during the evening and by the absence of any drugs or alcohol in his system at the time of the blood test. Investigators concluded that Ravnsborg had been on his personal phone for much of his commute from Redfield to Highmore, but that both phones were locked at the time of the accident. It was also determined that excessive speed did not contribute to the accident. Furthermore, despite varying opinions regarding how far his vehicle veered off the road, investigators concluded that Ravnsborg's vehicle was outside the lane of travel when the accident occurred.

[¶10.] Following the investigation, Ravnsborg was charged with three Class 2 misdemeanors in February 2021. Six months later, Ravnsborg entered a no contest plea to two misdemeanor charges: operating a motor vehicle while using a mobile electronic device in violation of SDCL 32-26-47.1 and improper lane driving in violation of SDCL 32-26-6. The State dismissed the third charge of careless driving in violation of SDCL 32-24-8. Ravnsborg also entered into a confidential civil settlement agreement with Boever's estate. Throughout the entire criminal investigation and after entering a no-contest plea, Ravnsborg continued to serve as attorney general.

## Impeachment Proceedings

[¶11.] Shortly after Ravnsborg entered his no-contest plea, the South Dakota House of Representatives established a select committee to consider whether articles of impeachment should be issued against Ravnsborg. On March 28, 2022, the select committee published its majority report, concluding that Ravnsborg did not commit an impeachable offense and recommended not issuing articles of impeachment. Despite the recommendation, two articles of impeachment were introduced against Ravnsborg in the South Dakota House of Representatives. Article I related to "crimes causing the death of Joseph Boever" and Article II related to "malfeasance in office following the death of Joseph Boever." Each article was passed by a majority vote on April 12, 2022.

[¶12.] On June 21, 2022, the South Dakota Senate held an impeachment trial. Ravnsborg was convicted under both articles of impeachment. As a result of the convictions, Ravnsborg was removed from office and permanently prohibited from holding any public office in South Dakota.

## Disciplinary Board Proceedings

[¶13.] Following the impeachment proceedings, a prosecutor from the impeachment trial filed a professional ethics complaint with the Board. The complaint alleged that Ravnsborg violated sections (b), (c), (d), and (e) of Rule 8.4 of the South Dakota Rules of Professional Conduct. These allegations related to the initial car accident that occurred on September 12, 2020, as well as Ravnsborg's conduct following the accident. The Board investigated the complaint and held a due process hearing. Ravnsborg was the only witness to testify at the hearing.

[¶14.] Following the hearing, the Board filed its findings of fact, conclusions of law, recommendation, and formal accusation with this Court. In the formal accusation, the Board stated that the investigation was limited to Ravnsborg's conduct following the accident. In considering Ravnsborg's post-accident conduct, the Board found that:

> 8. Attorney General Ravnsborg is regarded as the chief law enforcement officer for the State of South Dakota. Ravnsborg believes this is a public misperception.
>
> 9. Ravnsborg would not acknowledge that as chief law enforcement officer for the State he should be held to a higher standard of conduct.
>
> . . .
>
> 17. Soon after the accident became public, the South Dakota [G]overnor publicly requested that Ravnsborg take a leave of absence or resign his office of Attorney General, which he declined to do.
>
> 18. Following the September 12, 2020, incident, a thorough investigation was conducted by investigators from the State of North Dakota, because the South Dakota Division of Criminal Investigation (DCI) was under the supervision and control of Ravnsborg.
>
> 19. In August 2021, Ravnsborg entered a Nolo Contendere or no contest plea to two misdemeanors before the Honorable John Brown who had been appointed to hear the matters by the Supreme Court of South Dakota.
>
> . . .
>
> 26. When responding to the investigators' questions, Ravnsborg occasionally did not appear forthright, and only willing to acknowledge certain conduct after confronted with evidence by the investigators.
>
> 27. Ravnsborg frequently identified himself as "the Attorney General," including when encountering law enforcement for

minor traffic violations such as speeding, and when making a 911 call from the highway shortly after killing Joe Boever.

. . .

31. Ravnsborg was not sincere in his remarks concerning how badly he felt for Boever's family and bluntly stated "And I'm going down the road and my life changed" and that "I had no idea, to be clear, until the next morning when I found the body and it changed my life forever."

. . .

34. During the entire length of the investigation of his conduct which led to the death of Joe Boever, Ravnsborg insisted that he was not using his cell phone and that he was entirely on the driving lane of the highway, in accordance with the rules of the road. He was charged with using his phone and of being off the road at the time of the collision. He did not contest either charge and was convicted on both counts by the judge assigned to hear the matter.

35. During the period of time from the September 12, 2020 incident in which Joe Boever was killed and while continuing in the Office of Attorney General, being the chief law enforcement officer for the State of South Dakota, Ravnsborg made no public or private apology or expression of condolences to the victim's family; refused to acknowledge publicly his culpability; failed to understand and acknowledge that in his position as Attorney General he held a prominent position and was expected to evidence a higher standard of conduct than that expected of less prominent lawyers.

36. In his initial written response to the Board member assigned to the initial investigation of the complaint, Ravnsborg displayed a troubling lack of understanding of his obligations as a lawyer.

[¶15.]    Based on these findings, the Board concluded that:

B. Ravnsborg's conduct throughout the criminal investigation and impeachment process eroded public confidence in the legal profession.

    C. Ravnsborg violated Rule 8.4(d) of the Rules of Professional Conduct and his conduct was prejudicial to the administration of justice as follows:

        i. Ravnsborg's repeated statements to law enforcement officers who stopped him for traffic offenses that he was the Attorney General were improper and an attempt to use his office for improper purposes;

        ii. Ravnsborg's failure to accept responsibility for his conduct in killing Boever and his failure to acknowledge the detrimental impact it had on the legal profession;

        iii. Ravnsborg's concerns over the impact of the incident were more focused on his political and military careers than the victim, the victim's family and the public he served.

    D. Ravnsborg's conduct damaged and was detrimental to the image and integrity of attorneys, the bar association, and the legal profession as a whole.

The Board recommended Ravnsborg's license be suspended for a period of 26 months, retroactive from June 21, 2022.

[¶16.]      Ravnsborg denied the Board's findings of fact, conclusions of law, recommendation, and formal accusation. This Court appointed the Honorable Bradley Zell, retired circuit judge, as the Referee pursuant to SDCL 16-19-67(4), "for the taking of testimony and the making of findings and recommendations."

## Referee Decision

[¶17.]      A hearing was held before the Referee on November 13, 2023. Ravnsborg was the only witness to testify. The Referee also received documentary evidence including: the transcript of the impeachment trial and related documents; the Board's investigative file and transcript of the due process hearing; video and audio recordings of Ravnsborg's interviews with law enforcement; an audio

recording of the 911 call immediately after the accident; and video recordings of two unrelated interactions between law enforcement and Ravnsborg.

[¶18.]     Ravnsborg's testimony and post-hearing brief addressed several concerns that the Board identified in its findings of fact and conclusions of law. With respect to his apparent lack of remorse and sympathy for the Boever family, Ravnsborg testified that he attempted to express his condolences on several occasions both publicly and privately. When asked why he remained publicly silent during the criminal investigation and impeachment proceedings, he indicated that he was advised by his attorneys to "basically let the process play out and be respectful of the process but to largely remain silent." He also claimed his attorneys told him not to resign or take a leave of absence because such action could be perceived as an admission of guilt. He acknowledged, however, that his decision not to resign or take a leave of absence was predominantly motivated by his desire to protect his professional, political, and military careers.

[¶19.]     With respect to the 911 call immediately after the accident, Ravnsborg stated that he identified himself as the attorney general because his last name is difficult to spell, and he wanted to get help as soon as possible. He similarly stated that the reason for identifying himself as the attorney general to law enforcement during previous traffic stops was to identify why he was driving a state vehicle or to respond to inquiries regarding his involvement with law enforcement.

[¶20.]     The Referee filed his findings of fact, conclusions of law, and decision on January 11, 2024, finding that Ravnsborg did not violate sections (b), (c), and (d) of Rule 8.4 of the Rules of Professional Conduct. The Referee acknowledged that

many people believed Ravnsborg had been dishonest, but that much of this belief was based upon speculation, guess, or conjecture. The Referee further found that during the investigation Ravnsborg was not dishonest, misleading, or "otherwise conducting himself in a manner not befitting of an attorney."

[¶21.] With respect to Rule 8.4(e), the Referee found that Ravnsborg displayed an "ongoing pattern" of stating his professional title as the attorney general to law enforcement agencies for the "purpose of gaining favorable treatment." Regarding the traffic stops and subsequent interactions with Iowa and Nebraska law enforcement officers, the Referee found that "Ravnsborg would not have had to state what his title was unless asked." As for the 911 call, the Referee found that "[t]here was no reason for Ravnsborg to state that he was the Attorney General." Based on these findings the Referee concluded that "the ongoing pattern of Ravnsborg stating his title as Attorney General to agencies engaged in law enforcement functions would be for some purpose of gaining favorable treatment. Such conduct is a violation of Rule 8.4(e)."

[¶22.] Relying on its findings and conclusions, the Referee recommended Ravnsborg be publicly censured for violating Rule 8.4(e). Upon receipt of the Referee's report, this Court ordered the parties to submit briefs addressing their view of the Referee's findings and recommendations. This Court set the case for oral argument and heard from the Board, Ravnsborg's attorney, and Ravnsborg personally.

**Standard of Review**

[¶23.]     This Court "has inherent power to supervise the conduct of attorneys who are its officers." SDCL 16-19-20. As such, "[t]he ultimate decision for discipline of members of the State Bar rests with this Court." *In re Discipline of Dorothy*, 2000 S.D. 23, ¶ 16, 605 N.W.2d 493, 497 (citing *Matter of Claggett*, 1996 S.D. 21, ¶ 9, 544 N.W.2d 878, 880). Accordingly, when determining the appropriate discipline to be imposed, "this Court gives no particular deference to a referee's recommended sanction." *Id.* (citation omitted).

[¶24.]     SDCL Chapter 16-19 does not address the deference this Court should give to the findings of fact by a referee in disciplinary proceedings. Our prior decisions, however, have given "careful consideration to [the Referee's] findings as they had the advantage of seeing and hearing the witnesses." *Dorothy*, 2000 S.D. 23, ¶ 16, 605 N.W.2d at 497 (citation omitted). We have further stated that "[w]e will not disturb the [R]eferee's findings when they are supported by the evidence." *In re Discipline of Frauenshuh*, 2023 S.D. 18, ¶ 18, 989 N.W.2d 541, 549 (quoting *In re Discipline of Mines*, 2000 S.D. 89, ¶ 14, 612 N.W.2d 619, 626).

[¶25.]     Affording deference to the referee's findings in disciplinary proceedings when they are based upon live testimony is appropriate. We have not addressed, however, this Court's deference to a referee's findings that are predominantly based on documentary evidence. In other contexts, this Court has stated that a trial court's "superior fact-finding abilities relate to [the] opportunity to observe and evaluate live testimony; when physical or documentary evidence is offered, the trial court is in no better position to intelligently weigh the evidence than the appellate

court." *Peterson v. Evangelical Lutheran Good Samaritan Soc'y.*, 2012 S.D. 52, ¶ 17, 816 N.W.2d 843, 848–49 (citation omitted). Consequently, absent a rule requiring this Court to give deference to a specific factfinder, we review findings based on documentary evidence de novo. *Id.* ¶ 19.

[¶26.] Ravnsborg provided limited testimony at the referee hearing and the Referee's findings, particularly those relating to his honesty in speaking with law enforcement, were based solely upon documentary evidence. Because the Referee was in no better position than this Court is to weigh and consider documentary evidence, we afford no deference to the Referee's findings.

## Analysis

[¶27.] "A license to practice law in this state is a privilege and a continuing proclamation by the Supreme Court that a licensed attorney is an officer of the Court, is fit to be entrusted with legal and judicial matters, and is able to aid in the administration of justice. It is the duty of an attorney to act, both professionally and personally, in conformity with the standards of conduct governing members of the bar." SDCL 16-19-31. "The purpose of the attorney disciplinary process is not to punish the attorney." *Frauenshuh*, 2023 S.D. 18, ¶ 19, 989 N.W.2d at 549 (*In re Discipline of Swier*, 2020 S.D. 7, ¶ 57, 939 N.W.2d 855, 868). Rather, the three main goals are to (1) "[protect] the public from further fraudulent, unethical or incompetent activities" the attorney is involved in; (2) "[preserve] the image and integrity of the attorneys, the bar association and the legal profession as a whole"; and (3) "deter like conduct by other attorneys." *Id.* (citations omitted). "The real and vital issue to be determined is whether or not the accused, from the whole

evidence as submitted, is a fit and proper person to be permitted to continue in the practice of law." *Id.* (quoting *Swier*, 2020 S.D. 7, ¶ 57, 939 N.W.2d at 868).

[¶28.] Ravnsborg was charged with misconduct under Rule 8.4(b), (c), (d), and (e) of the South Dakota Rules of Professional Conduct. Ravnsborg challenges the findings and conclusions of the Board and Referee that his conduct violated one or more of these provisions. Thus, we initially consider whether Ravnsborg engaged in professional misconduct under Rule 8.4(b), (c), (d), and (e).

### 1. Rule 8.4(b)

[¶29.] Rule 8.4(b) provides "[i]t is professional misconduct for a lawyer to: commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]" "Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category." *Matter of Hill*, 144 N.E.3d 184, 190 (Ind. 2020) (citation omitted). In other words, to find a Rule 8.4(b) violation, there must be a nexus between the criminal conduct and the attorney's fitness to practice law.[3] *Id.*

[¶30.] Ravnsborg was convicted of two misdemeanor offenses: operating a motor vehicle while using a mobile electronic device and improper lane driving. *See*

---

3. In addition to Rule 8.4(b), an attorney is subject to discipline under SDCL 16-19-37 in the form of an immediate suspension, upon conviction "of a serious crime." The term "serious crime" under SDCL 16-19-37 "includes any felony and [lesser crimes involving improper conduct as an attorney]."

SDCL 32-26-47.1; SDCL 32-26-6. Although these violations resulted in serious consequences, they lack a clear link to Ravnsborg's fitness to practice law under Rule 8.4(b) and are not serious crimes within the meaning of SDCL 16-19-37.

### 2. Rule 8.4(c)

[¶31.] Rule 8.4(c) prohibits a lawyer from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" Ravnsborg urges this Court to adopt the Referee's conclusion that he did not violate Rule 8.4(c). He argues that the Referee correctly found that the facts could not prove he was dishonest, misleading, or uncooperative throughout the investigation and any allegation to the contrary was not based upon fact.

[¶32.] From our review of the record, several of Ravnsborg's statements after the accident raise significant questions about his honesty and truthfulness. Ravnsborg's statement to the 911 operator that he hit something "right in the roadway" and his statements to investigators that he believed he was in the roadway are contrary to the forensic evidence. While there was some question regarding how far onto the shoulder Ravnsborg's vehicle was, the forensic evidence clearly established Ravnsborg's vehicle was not in the middle of his driving lane when it struck Boever.

[¶33.] In addition, Ravnsborg's statements regarding his phone usage on the night of the accident raise serious concerns about his truthfulness with investigators. At the outset of his second interview with NDBCI, Ravnsborg emphatically denied using his phone while driving back from Redfield, except for two calls he made to his father shortly after leaving Redfield. Ravnsborg denied

accessing his emails at *any point* during his commute home and stated that he did not text anyone or otherwise recall using his phone at any time during the drive.

[¶34.]    Later in the interview, investigators told Ravnsborg that they found "internet activity" on his phone just before the accident occurred. Ravnsborg responded by stating "I don't not use my phone" but reaffirmed that he was not using either phone at the time of the crash. Ravnsborg was then directly asked if he used his phone up to the time of the crash. In response, Ravnsborg put his head down, remained silent for a few seconds, and eventually stated "not that I can recall." Ravnsborg explained that he remembered setting the phone down when he drove into Highmore because it had fallen from the vehicle's center console during the trip but emphasized "I was not using it at the time [of the crash]." Ravnsborg was then asked what he was doing with the phone before he got to Highmore to which he responded by stating, "I looked at the time . . . I glanced at it . . . but nothing sticks out to me."

[¶35.]    Ravnsborg was then confronted with specific metadata found on his phone shortly before he had made the 911 call at 10:24 p.m. The metadata showed Ravnsborg had unlocked his phone, checked his Yahoo email account, accessed the Dakota Free Press website, and clicked on a political news article minutes before the accident. Once informed of this information, Ravnsborg's story took another turn. He admitted that he "looked at stuff" on his phone and then sat it down to begin thinking about cases from work but reiterated that he was not looking at his phone when the accident happened.

[¶36.]     Like Rule 8.4(b), the prohibition against dishonesty, fraud, deceit, or misrepresentation in Rule 8.4(c) applies in the context of a lawyer's professional obligations and ability to practice law.  "The purpose of lawyer discipline is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession." ABA Standards for Imposing Lawyer Sanctions, Standard 1.1 (Am. Bar Ass'n 1992). "Not every lawyer misstatement poses that risk . . . [i]nstead, there must be a rational connection between . . ." the dishonest act and purpose of attorney discipline to protect the profession and administration of justice.  *In re Conduct of Carpenter*, 95 P.3d 203, 208 (Or. 2004).  "If the evidence in a discipline case does not establish such a nexus, then the lawyer is not subject to professional discipline."  *Id.*

[¶37.]     In the context of attorney misconduct, we define dishonesty as "conduct evincing a lack of honesty, probity or integrity; [a] lack of fairness and straightforwardness[.]" *Attorney Grievance Comm'n. of Maryland v. McDonald*, 85 A.3d 117, 140 (Md. 2014) (quoting *Attorney Grievance Comm'n v. Sheridan*, 741 A.2d 1143, 1156 (Md. 1999)).  This also "encompasses the nondisclosure of a material fact." *In re Conduct of Gatti*, 8 P.3d 966, 973 (Or. 2000) (citing *In re Weidner*, 801 P.2d 828, 832 n.2 (Or. 1990)).  This "may be a lie, a half-truth, or even silence." *Id.* (citation omitted).  "A misrepresentation becomes fraud or deceit 'when it is intended to be acted upon without being discovered.'" *Id.* (quoting *In re Hiller*, 694 P.2d 540, 542–44 (Or. 1985)).

[¶38.] We emphasize that Ravnsborg, just like every other criminal defendant, had a constitutional right to maintain silence. However, once he decided to submit to an interview with NDBCI, Ravnsborg failed to conduct himself with honesty. His evolving explanation regarding the extent of his cell phone use while driving involved actual dishonesty and misrepresentations within the meaning of Rule 8.4(c). Ravnsborg initially denied ever using his phone while driving, except to call his father. He only reluctantly admitted that he "looked at stuff" on his phone after he was confronted with specific information found on his phone. Even then, Ravnsborg attempted to downplay the extent of his phone usage by stating that he only used his phone to check the time.

[¶39.] At oral argument, Ravnsborg's explanation about his statements to NDBCI concerning his phone usage raises even more concerns. Ravnsborg told this Court that he denied using his phone during the trip because he believed that his phone usage at the time of the accident was the only relevant time period regarding his phone activity. The questions from law enforcement were clear and directed Ravnsborg to disclose *any* phone use on the drive back from Redfield. Further, he would have undoubtedly been aware that law enforcement was investigating whether any violations of the law had occurred on the night of the accident and that using his phone at any point while driving was a statutory violation. *See* SDCL 32-26-47.1. Despite this knowledge and the clarity of the questions, Ravnsborg continued to deny or omit this information until it became obvious that investigators already knew the answer to their questions. Ravnsborg's responses demonstrated a concerted effort to avoid criminal liability, through dishonesty and

misrepresentations, which violated Rule 8.4(c). Finally, Ravnsborg's patent dishonesty concerning the use of his phone, as well as the developed forensic evidence, raise genuine questions about the integrity of his statements regarding the night of the accident. This conduct, particularly considering Ravnsborg's prominent position as attorney general, reflected adversely on the legal profession as a whole and impeded the administration of justice.

### 3.    Rule 8.4(d) and (e)

[¶40.]    Rule 8.4(d) states that "[i]t is professional misconduct for a lawyer to: engage in conduct that is prejudicial to the administration of justice[.]" Additionally, Rule 8.4(e) states that "[i]t is professional misconduct for a lawyer to: state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law[.]" The Board found that Ravnsborg failed to acknowledge his unique position as attorney general and how his post-accident actions were prejudicial to the administration of justice. The Board also found that Ravnsborg repeatedly used his political title when interacting with law enforcement to receive a personal benefit; failed to accept responsibility for his conduct in killing Boever; and was more concerned with the accident's impact on his professional career than its impact on the victim, the victim's family, and the public. The Referee agreed with the Board's findings that Ravnsborg improperly used his title as attorney general to receive favorable treatment but did not adopt the remaining findings of the Board.

[¶41.]    Ravnsborg claims that the Board's description of his authority as the attorney general is based on semantics and misperceptions rather than fact.

-18-

Furthermore, Ravnsborg argues that it was important for him to continue in office, despite the ongoing investigation, because any other action would have been perceived as an admission of wrongdoing. He also contends that his office was engaged in important tasks, including an investigation of the Governor, that he believed would end if he stepped down.

[¶42.] Ravnsborg's statements and arguments throughout the disciplinary proceedings, including to this Court, demonstrate Ravnsborg's lack of awareness and unwillingness to acknowledge the unique authority and responsibility he held as attorney general. The attorney general has "concurrent jurisdiction with the state's attorney" in every county of the state. SDCL 23-3-3. The attorney general also has the "authority to sign, file, and present any and all [charging documents] and papers of any kind which the state's attorney might do in any criminal proceeding, and to appear before all" courts of this state in any criminal proceeding. SDCL 23-3-4. The attorney general further possesses the authority to appoint assistants across the state having "the same powers with respect to the enforcement of law as [held by law enforcement]," including "the detection, apprehension, arrest, and prosecution of anyone violating any of the criminal laws of the state when so directed by the attorney general[.]" SDCL 23-3-10. These statutory duties presuppose that the attorney general is the chief law enforcement officer of the state. *See also Disciplinary Counsel v. Dann*, 979 N.E.2d 1263, 1269 (Ohio 2012) ("As the chief law officer for the state, the attorney general is charged with providing legal representation and advice to all officers, boards, heads of departments, and institutions of this state.").

[¶43.]     Ravnsborg's fundamental misapprehension of his responsibilities as attorney general and his resulting actions were prejudicial to the administration of justice. By choosing to continue to serve as attorney general during a period of time that he was the subject of a homicide investigation, Ravnsborg was obligated to maintain the public trust and confidence of his office. *See Dann*, 979 N.E.2d at 1269 ("Like judges, the attorney general has a heightened duty to the public by virtue of his elected office."). The incongruity of a criminal investigation involving his personal conduct and his service as attorney general may have been irreconcilable, but at a minimum, by choosing to continue to serve as attorney general, Ravnsborg carried a tremendous burden to assure the public that the functions of his office, and law enforcement across the State, would continue without interruption. Failure to conform to these unique obligations harms the public far greater than that of an ordinary attorney. *See Hill*, 144 N.E.3d at 193 ("The duty of judges and prosecutors to conform their behavior to the law does not arise solely out of their status as attorneys. As officers charged with the administration of law, their own behavior has the capacity to bolster or damage public esteem for the system different than that of attorneys otherwise in practice.").

[¶44.]     It is evident, even as of the time of oral argument to this Court, that Ravnsborg failed to consider how his actions following the accident and the subsequent investigation, would impact his office's ability to fulfill its duties in such a way that maintained the public's confidence. During this time, Ravnsborg concealed himself from the public eye, failed to acknowledge the seriousness of the ongoing investigation, and perhaps most importantly, did nothing to reassure the

public that he could continue to perform his responsibilities as attorney general while the investigation and criminal prosecution continued. Each decision he made was influenced by personal aspirations and political survival rather than his responsibility to serve the public and uphold the integrity of his office. Ravnsborg's actions cast a cloud of needless scrutiny on the office of the attorney general. His actions raised genuine doubts about whether he could fulfill his responsibilities as the State's chief law enforcement officer. Ravnsborg's conduct necessarily interfered with the administration of justice and violated Rule 8.4(d).

[¶45.] Additionally, Ravnsborg's pattern of using his title as the attorney general to gain a personal benefit also violated Rule 8.4(d) and (e). Ravnsborg claims that each incident was for modest purposes such as explaining the registration on his vehicle to law enforcement, identifying the purpose of driving a state-owned vehicle, and responding to an officer's question regarding his affiliation with law enforcement.

[¶46.] Prior to the accident, Ravnsborg identified himself as the attorney general on two separate occasions immediately after being pulled over for alleged traffic violations. On one occasion, a Nebraska police officer pulled Ravnsborg over for speeding and asked him for his license and registration. Ravnsborg's immediate response was to identify himself as a unit commander in the Army Reserve and stated that "my other thing is . . . I'm also the attorney general in South Dakota." In a similar manner, Ravnsborg was pulled over in Iowa for running through a four-way stop. In response to being asked for his license and registration, Ravnsborg stated "I have a driver's license . . . it's a state car and I'm actually the attorney

general [in South Dakota]."[4]  In each instance, the officer released Ravnsborg

without issuing a citation.  A review of each video shows ill-disguised yet successful

efforts by Ravnsborg to use his position as attorney general to avoid culpability.

[¶47.]    This pattern of conduct continued on the night of the accident.

Ravnsborg introduced himself to the 911 operator on the night of the accident as the

attorney general.  After the operator answered Ravnsborg's call, Ravnsborg

immediately stated, "this is the Attorney General[,]" and did not use his real name

until asked by the operator later on in the call.  At that moment in time, there was

no legitimate reason to identify himself as the attorney general.  These interactions

display an ongoing pattern of conduct of using his professional title to improperly

influence government officials or receive special treatment.  This conduct interfered

with the administration of justice in violation of Rule 8.4(d) and Rule 8.4(e).

## Appropriate Discipline

[¶48.]    This Court is authorized to discipline attorneys for misconduct, which

may include: (1) disbarment; (2) suspension for a specific period of time "not to

exceed three years;" (3) "[p]lacement on a probationary status" for a period of time

and with such conditions as this Court deems appropriate; (4) public censure; and

(5) "[p]rivate reprimand by the board."  SDCL 16-19-35.  When considering the

---

4.    At the Board hearing, Ravnsborg testified that after being pulled over in Iowa, he identified himself as the attorney general after the officer saw Ravnsborg's badge and asked him if he was involved in law enforcement. However, the recording does not support Ravnsborg's claim.  It does not appear that Ravnsborg was ever asked if he was involved in law enforcement, and his testimony regarding this interaction lacked candor and honesty. Instead, the recording shows Ravnsborg volunteered this information on his own and without any inquiry concerning his affiliation with law enforcement.

appropriate discipline to impose we consider "the seriousness of the misconduct and the likelihood that it or similar misconduct will be repeated. We also consider the prior record of the attorney." *In re Discipline of Eicher*, 2003 S.D. 40, ¶ 47, 661 N.W.2d 354, 369 (internal citation omitted). "A lawyer must be held accountable for his or her acts, even if the results were unintended, but we must not be unfair to the lawyer." *In re Discipline of Janklow*, 2006 S.D. 3, ¶ 17, 709 N.W.2d 28, 34.

[¶49.]     The Board relies on the factual similarities between this case and *In re Discipline of Janklow* and recommends this Court impose a 26-month suspension retroactive to the date Ravnsborg was impeached from office, similar to the sanction imposed in *Janklow*. We have routinely stated that we must decide each disciplinary proceeding upon its own set of unique facts. *Mines*, 2000 S.D. 89, ¶ 16, 612 N.W.2d at 626 (citation omitted). Moreover, *Janklow* is distinguishable from the case currently before us. In *Janklow*, the respondent attorney was convicted of felony reckless manslaughter arising from a motor vehicle accident, whereas Ravnsborg was convicted of two Class 2 misdemeanors arising from the accident that caused Boever's death. 2006 S.D. 3, ¶ 9, 709 N.W.2d at 32. Furthermore, a retroactive punishment was appropriate in *Janklow* because the attorney self-reported his felony conviction and was subject to immediate suspension of his law license once he was convicted, pursuant to SDCL 16-19-37. *Id.* ¶ 4. In contrast, Ravnsborg was not subject to an automatic suspension of his license due to his misdemeanor convictions. Instead, Ravnsborg voluntarily refrained from practicing law after he was impeached.

[¶50.] "After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose." *Claggett*, 1996 S.D. 21, ¶ 16, 544 N.W.2d at 881 (quoting ABA Standards for Imposing Lawyer Sanctions, Standard 9.1 (Am. Bar Ass'n 1992)). Mitigating factors this Court may consider include the attorney's "character or reputation" and the "remoteness of prior offenses." ABA Standards for Imposing Lawyer Sanctions, Standard 9.3 (Am. Bar Ass'n 1992). The aggravating factors we may consider include, but are not limited to, the attorney's pattern of misconduct, refusal to acknowledge the nature of his misconduct, the seriousness of the misconduct, and the impact their conduct had on the profession's image and integrity. *See Mines*, 2000 S.D. 89, ¶ 17, 612 N.W.2d at 627; *see also Dann*, 979 N.E.2d at 1268–69.

[¶51.] Since his admission to practice law in 2001, Ravnsborg has been the subject of one prior disciplinary complaint while in private practice. The complaint did not proceed to the formal disciplinary process and the record is devoid of any information regarding the nature of the complaint. Ravnsborg has not practiced law since his impeachment, and he indicates that he does not plan to practice law in South Dakota after these proceedings are concluded. We recognize that between his military service and involvement in state government, Ravnsborg has been a well-respected public servant for most of his career. He was decorated on several occasions for his military service and is under consideration for a promotion to colonel in the Army Reserve.

[¶52.] The accident on September 12, 2020, resulted in the death of Joseph Boever and Ravnsborg's conduct following the accident is the subject of this

disciplinary proceeding. During this time, Ravnsborg dishonestly communicated with investigators in an effort to diminish or avoid criminal culpability. Ravnsborg's actions while being the subject of a homicide investigation and continuing as attorney general, were also prejudicial to the administration of justice. Further, Ravnsborg displayed an ongoing pattern of misusing his position as the attorney general to receive beneficial treatment. Ravnsborg's misuse of his position as attorney general and dishonesty toward law enforcement during a criminal investigation are contrary to the expectations of him as an attorney and particularly the heightened obligations upon him as attorney general. *See Dann*, 979 N.E.2d at 1268–69 (When a public official, such as the attorney general, commits ethical violations it "cause[s] incalculable harm to the public perception of the attorney general's office and those government agencies, departments, and institutions that the attorney general advises and represents."). In the course of this disciplinary proceeding, Ravnsborg has not acknowledged or accepted responsibility for this conduct but has continued to justify his actions.

[¶53.] After reviewing the facts and weighing the relevant mitigating and aggravating factors, the Court hereby suspends Ravnsborg's license to practice law in South Dakota for a period of six months. While Ravnsborg is unlikely to continue practicing law in South Dakota, we conclude suspension is necessary to preserve the integrity of the profession and deter like conduct by other attorneys. The six-month suspension shall commence on the date of entry of the order of suspension. Pursuant to SDCL 16-19-70.4, Ravnsborg shall also be responsible for reimbursing the State Bar of South Dakota for all costs and expenses related to these

proceedings. These costs and expenses shall be reimbursed prior to his reinstatement to practice law in South Dakota.

[¶54.] KERN, SALTER, DEVANEY, and MYREN, Justices, concur.